LEVITT & KAIZER
ATTORNEYS AT LAW
40 FULTON STREET
17th FLOOR
NEW YORK, NEW YORK 10038-1850

RICHARD WARE LEVITT*
rlevitt@landklaw.com

NICHOLAS G. KAIZER**
nkaizer@landklaw.com

ZACHARY SEGAL
zsegal@landklaw.com

* ADMITTED IN NY, FLA. AND D.C.
** ADMITTED IN NY AND FLA.

TELEPHONE
(212) 480-4000

FACSIMILE
(212) 480-4040

October 15, 2026

**VIA ECF**
Hon. Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Daniel Sikkema*, 24 Cr. 227 (ER)**
**Defendant's Sentencing Letter**

Dear Judge Ramos:

We write on behalf of our client, Daniel Sikkema, in advance of his sentencing on November 4, 2026. Mr. Sikkema stands convicted on all three counts of the superseding indictment. Because Counts One and Two carry a mandatory sentence of life imprisonment under 18 U.S.C. § 1958(a), we recognize that the Court has no discretion as to the term of imprisonment, and we do not ask the Court for something it cannot give.

We write nonetheless, for three reasons. First, the Presentence Report and the record of this sentencing will travel with Daniel for the rest of his life. The Bureau of Prisons relies on the PSR to decide where he will be housed, how he will be classified, what programming and treatment he will receive, and how staff will understand him. Second, under 18 U.S.C. § 3621(b), the Bureau must consider "any statement by the court that imposed the sentence" concerning the purposes of the sentence or recommending a type of facility, and the Bureau's own classification policy commits it to "attempt[] to satisfy judicial recommendations" when consistent with sound correctional management. The Court's words at sentencing will therefore matter long after this proceeding ends. Third, the Court should have before it, and the record should reflect, a full and accurate picture of the man being sentenced: a 56-year-old father with no prior criminal convictions, who survived a childhood of poverty and sexual abuse, who spent more than a decade as the devoted, full-time caregiver to his son, and whom the government's own witnesses, people who had known him for ten to twenty years, described as kind, respectful and nonviolent.

Mr. Sikkema respects the jury's verdict, and for purposes of this submission we accept it, as we must. He intends to pursue his appellate rights, however, and nothing in this letter is intended as, or should be construed as, an admission or a waiver of any issue

for appeal. For that reason, and on the advice of counsel, Mr. Sikkema did not discuss the offense conduct with the Probation Office (PSR ¶ 33 & p. 28), and this letter does not either.

Additionally, we address below a request that the Court recommend to the BOP waiver of the Sentence Length Public Safety Factor and designation to a medium-security institution near New York City, preferably FCI Otisville.

**<u>Daniel's Life Before this Case</u>**

One fact about this case is particularly difficult to reconcile with the crime reflected in the verdict: until now, Daniel had lived more than five decades without a criminal conviction. The Presentence Report describes this prosecution as his "first known criminal conviction." PSR at p.27; PSR ¶¶ 46-48.

The trial record likewise contained substantial evidence — including from government witnesses — that before this case Daniel was known as a kind and nonviolent person. Among many others, Jessica Gomez, who knew Daniel well, testified that he was kind and respectful to her and her mother and that she had never seen him act violently toward anyone. Tr. 361-63; Maria Gomez; Tr. 388; Angela Liriano, Tr. 78. That history cannot undo what occurred in January 2024. But it remains relevant in understanding how profoundly disconnected this offense was from the life Daniel had previously led.

Much of that earlier life was devoted to his family. Daniel and Brent began their relationship in 2007 and ultimately married in 2013. Jane Pearl, Daniel's matrimonial attorney, testified that Daniel had been a committed husband to Brent: he tended to Brent's needs, traveled with him, helped him in his business, and performed the ordinary and sometimes mundane tasks by which one person builds a life with another. Tr. 1089-90.

The center of Daniel's life, however, became their son, L[redacted] The PSR records that during the marriage Daniel managed the family's properties and served as L[redacted]s's full-time caretaker. *See* PSR ¶ 79. Ms. Pearl testified that Daniel was caring for L[redacted] more than 95 percent of the time and sought work flexible enough to allow him to remain available for L[redacted]'s educational needs. Tr. 1089-91. L[redacted] himself described Daniel as the primary person who cared for him — cooking his meals, doing his laundry, and caring for him when he was sick. Tr. 1026.

That relationship continues despite Daniel's incarceration. According to the PSR, Daniel speaks with L[redacted] daily by telephone, and L[redacted] visits him at MDC Brooklyn with his guardian every two to three months. *See* PSR ¶ 63. Nothing we can say here can adequately describe what Daniel's permanent imprisonment will mean to his son — or what the loss of both of his fathers, in profoundly different ways, has already meant to him.

**The Collapse of the Marriage**

The end of Daniel and Brent's marriage was bitter and contentious. But it is important that the permanent record not reduce that deterioration simply to a dispute over money. There was substantial evidence at trial concerning Brent's increasing use of cocaine and other drugs and Daniel's concern about its effect both on Brent and on L[redacted]. Ms. Pearl testified that Daniel filed for divorce because of Brent's substance abuse; that Daniel became frightened for his own safety and for L[redacted]'s physical and emotional safety; and that Daniel nevertheless hoped Brent would recover, stop using drugs, and remain an active, involved and caring parent to L[redacted] after the divorce. Tr. 1085-86. The Court also recognized during trial that evidence had been presented concerning Daniel's concerns about Brent's drug use and sexual relationships outside the marriage. Tr. 358-59.

We emphasize that none of this justified Brent's killing. Nothing could. But it provides context for what otherwise appears incomprehensible. This was not a man with a history of predation or violence who eventually committed the sort of crime toward which his life had been moving. It was an offense arising from the catastrophic collapse of a long intimate relationship, during an emotionally charged divorce, against the background of Daniel's increasing concern — whether reasonably or unreasonably expressed — about the welfare of the child who had become the central focus of his life.

One part of Ms. Pearl's testimony is particularly important in that regard. Even after Daniel decided that his marriage to Brent could not continue, she testified that Daniel wanted Brent to recover and remain in L[redacted]'s life as an active parent. The verdict necessarily establishes that at some point Daniel crossed an unfathomable line. But accepting the jury's verdict for these purposes, as we must, the circumstances in which he did so were intensely personal and singular. Nothing in his history suggests that violence was an ordinary means by which he resolved conflict. To the contrary, the life that preceded this offense supports the conclusion that the conduct for which he stands convicted was profoundly aberrational.

**Daniel's Background**

The PSR also recounts a childhood that was difficult in ways that bear mentioning without overstating their significance. Daniel grew up in Cuba under financially strained circumstances. His father developed alcoholism and used physical force as discipline. Daniel reported that between the ages of four and ten he was repeatedly sexually abused by several older relatives and told no one. *See* PSR ¶¶ 56-57. None of those experiences excuses an adult's later conduct, and we do not invoke them for that purpose. They are nevertheless part of the history of the person before the Court and part of the full account that should accompany him through the prison system.

Daniel later established himself in Spain and then in the United States, becoming a naturalized American citizen. *See* PSR ¶ 58. He worked in different occupations, helped manage businesses and family properties, assisted Brent professionally, and ultimately made caring for L[redacted] his principal work. *See* PSR ¶¶ 74-82. The picture is not one of a person who spent his life taking from others. Much of it was spent caring for them.

**Adjustment to Incarceration**

Daniel has now been continuously incarcerated since February 2025. We do not ignore the disciplinary infraction described in the PSR. In July 2025, Daniel was found in possession of an item classified as a dangerous weapon and was sanctioned. *See* PSR para. 6. That incident is part of the record and should be acknowledged.

It is equally important, however, to consider the balance of his institutional record. The PSR identifies no other known disciplinary infraction. Daniel has worked in food services at MDC; completed educational courses in leadership, reading, tutoring and other subjects; completed Phase I of the National Parenting Program; earned a GED while at MDC Brooklyn; and served as an English-language tutor to other incarcerated people. He spends his free time reading, writing and exercising. *See* PSR ¶ 7. Those are not trivial matters for a man who knows that, absent some extraordinary future development, he will never again live outside a prison. They suggest that Daniel is capable not merely of complying with institutional life, but of contributing positively to the community in which he must now spend that life. A life sentence need not become a sentence to purposelessness.

**Requests to Clarify/Correct PSR**

On October 6, 2026, undersigned counsel wrote to Probation, raising certain objections to the PSR. Probation responded that since the last date to register objections to the draft PSR was September 23 and the final PSR had issued, "they will need to be addressed with the Court and if so ordered, can be made post-sentencing." These are our obections, which we respectfully ask the Court to address:

1. **¶ 50 (Order of Protection).** The paragraph states that an order of protection "was issued to the defendant on May 20, 2022, and filed against his now deceased husband," and names L[redacted] as a protected person. Read quickly, the first clause could be misread as an order *against* Mr. Sikkema. We ask that the paragraph be revised to state plainly that the order protected Mr. Sikkema and L[redacted] and was directed against Brent Sikkema, and that it be moved out of the "Other Criminal Conduct" section, which may otherwise be read by the BOP as reflecting conduct by Mr. Sikkema.

2. **¶ 51 and p. 27 ("fugitive from a foreign country").** We ask that the report state expressly that no detainer has been lodged, consistent with the face sheet

("Detainers: None"), and that the NCIC entry reflects a Brazilian proceeding arising from the same conduct for which he is being sentenced here. The BOP scores detainers in classification, and the label "fugitive" is misleading for a man who has been in this Court's jurisdiction or custody continuously since his arrest.

3. **¶¶ 67 and 69 (medications).** The report lists "[redacted])." [redacted] is the generic name for [redacted]; [redacted] is [redacted], a different drug. We ask that the entries be conformed to the MDC and community treatment records, so the BOP's medical staff have an accurate medication history.

4. **¶ 10 and footnote 2 (family).** ¶ 10 states that Mr. Sikkema "did not work during the marriage and served as a stay-at-home father," and footnote 2 notes that L[redacted] "is not the biological child of the victim." Both statements are literally accurate. We ask that the report also reflect what the trial established: that Daniel was L[redacted]s primary caregiver and managed the family's homes (Tr. 69, 205, 341, 1026, 1089; PSR ¶ 79), and that L[redacted] regards both men as his fathers and was raised by both (Tr. 1026; PSR ¶ 60).

5. **Spelling.** "Benigno Rodrguez" (¶ 60) should read "Benigno Rodriguez," and Mr. Sikkema's cousin's name appears as "Myra Sotorrios" (¶ 63) but was given at trial as "Mayra Sotorrios" (Tr. 370). We understand "Mayra" to be Ms. Sotorrios's proper first name. Accurate names matter for the BOP's visiting and contact lists.

**<u>The Court Should Make a Specific BOP Recommendation: waiver of the sentencing length public safety factor and designation to a medium-security institution near New York City, preferably FCI Otisville</u>**

Because the Court cannot alter the mandatory term of imprisonment, one of the most consequential things it can do at sentencing is make a specific recommendation concerning the manner in which that sentence is administered.

Congress has directed BOP, in designating the place of imprisonment, to consider among other things the prisoner's security designation, programmatic needs, mental and medical health needs, the history and characteristics of the prisoner, and recommendations of the sentencing court. *See*18 U.S.C. § 3621(b). BOP likewise states that its classification and designation functions are centralized at the Designation and Sentence Computation Center (DSCC) and are performed in accordance with Program Statement 5100.08, Inmate Security Designation and Custody Classification.

The current BOP policy has an unusual and important consequence here. Program Statement 5100.08 provides that a male inmate with more than 30 years remaining to serve, including a non-parolable life sentence, ordinarily must be housed at a High security level

institution unless the Sentence Length Public Safety Factor (PSF) is waived. *See* BOP Program Statement 5100.08, Inmate Security Designation and Custody Classification, ch. 5, p. 9 (Sept. 12, 2006), as amended by Change Notice 3 (May 6, 2026).[1] Thus, absent a waiver, Daniel's life sentence itself ordinarily drives him to a penitentiary-level placement regardless of what his ordinary security-point calculation might otherwise indicate.

The same Program Statement expressly provides a mechanism for relief. A PSF may be waived after review and approval by the DSCC Administrator; the policy states that only the DSCC Administrator is authorized to waive a PSF. *Id*. ch. 5, p. 4. A judicial recommendation cannot bind BOP, but it is a statutory factor BOP must consider under § 3621(b), and it can give the DSCC a focused reason to evaluate whether the Sentence Length PSF should control Daniel's placement for the remainder of his life.

Daniel's circumstances warrant such a recommendation. He is 56 years old. This is his first criminal conviction. Apart from the conduct underlying this case, he has no comparable history of violence, no history of escape, and no gang affiliation reflected in the PSR. He is a naturalized United States citizen and therefore has no immigration detainer. His pre-offense life was centered on family rather than crime. His institutional record, although not unblemished, reflects work, education, tutoring, sustained family contact, and only one known disciplinary infraction over the period reported in the PSR.

Accordingly, we respectfully ask the Court to recommend that BOP, through the DSCC, consider waiver of Daniel's Sentence Length PSF and, if consistent with BOP policy, institutional safety and bed availability, designate him to a medium-security institution as close as practicable to New York City, preferably FCI Otisville. BOP currently identifies FCI Otisville as a medium-security federal correctional institution. Placement there would permit Daniel's teenage son to maintain a meaningful relationship with his father through regular visitation and would preserve access to the family and community support that remain available to him.

This request does not minimize the offense. It recognizes instead that institutional security should be individualized to the person who must actually be managed. A life sentence is punishment enough; the sentence need not automatically carry the additional consequence of permanent confinement at the highest ordinary security level if BOP, after individualized review, concludes that such a level is unnecessary.

We further ask the Court to recommend access to appropriate educational, vocational and mental-health programming, and that Daniel be permitted to continue productive employment and tutoring to the extent available. If BOP declines to waive the Sentence Length PSF, we ask the Court to recommend placement at the closest appropriate

---

1 Viewable at: https://www.bop.gov/policy/progstat/5100_008_cn-3.pdf.

facility to New York City consistent with Daniel's security classification, safety, and program needs.

**Requested Language for the Judgment and Commitment Order**

We respectfully request that the Court state its recommendation orally at sentencing and include substantially the following language in the Judgment:

> **The Court recommends that the Bureau of Prisons, through the Designation and Sentence Computation Center, consider waiver of the Sentence Length Public Safety Factor applicable to Mr. Sikkema under BOP Program Statement 5100.08 and, if consistent with BOP policy, institutional safety and bed availability, designate him to a medium-security institution as close as practicable to New York City, preferably FCI Otisville, in order to facilitate continued contact with his minor son and access to appropriate educational, vocational and mental-health programming. If such waiver is not granted, the Court recommends designation to the closest appropriate facility to New York City consistent with his security classification, safety and program needs.**

Because BOP receives and considers the sentencing materials in making an initial designation, we also respectfully ask the Court to state this recommendation expressly on the record so that it is unambiguous in the materials transmitted to the DSCC.

**Conclusion**

Nothing in this submission asks the Court to forget Brent Sikkema. A human being was killed violently and deliberately. L[redacted] has suffered a loss of a different and uniquely painful kind. The jury determined that Daniel bears criminal responsibility for causing Brent's death, and the law fixes the punishment that follows from that determination.

But the verdict did not erase the preceding decades of Daniel's life. He was a son who came from difficult circumstances, an immigrant who became an American citizen, a husband who for many years cared for his spouse, a friend whom people experienced as kind and respectful, and most importantly a father who organized virtually every aspect of his life around caring for his child. Before this case, he had never been convicted of a crime and was not known as a violent man. The terrible act of which he has been convicted must now coexist with all of those facts.

Daniel will spend the rest of his life paying for what occurred. We respectfully ask that the punishment Congress has mandated not be made harsher than necessary by treating him institutionally as though the extraordinary act reflected in this verdict defines

everything about him or establishes that he requires permanent confinement at a high-security penitentiary without individualized consideration.

For those reasons, we respectfully request that the Court make the Bureau of Prisons recommendations set forth above and otherwise direct that the full account of Daniel's history, family relationships, institutional adjustment and character accompany him as his sentence is administered.

Respectfully submitted,

Richard Ware Levitt
Florian Miedel
Attorneys for Daniel Sikkema