**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 28, 2026

**BY CM/ECF**
The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
United States Courthouse
40 Foley Square
New York, New York 10007

**Re: *United States v. Daniel Sikkema*, S1 24 Cr. 227 (ER)**

Dear Judge Ramos:

The Government respectfully submits this letter in advance of the sentencing of defendant Daniel Sikkema, scheduled for November 4, 2026. The defendant planned over the course of months and paid for the violent murder of his husband—who was stabbed eighteen times—in Brazil. The defendant tried to hide his involvement in the murder he directed by using the identities of his unwitting former employees and friends and, after the murder was complete, showed no remorse and instead attempted to cash in on his deceased husband's estate. In short, the defendant's crime was cold-blooded and calculated.

For this crime, the defendant now stands guilty after a two-week trial of three counts—murder for hire conspiracy ("Count One"), murder for hire ("Count Two"), and conspiracy to commit murder in a foreign country ("Count Three"). The Court must impose a life sentence on Counts One and Two. In addition, for the reasons that follow, the Court should also impose a life sentence on Count Three, where the defendant faces a United States Sentencing Guidelines ("Guidelines") range of life imprisonment.

## I. Background

### A. The Prelude

The defendant, a native of Cuba, and Brent Sikkema ("Brent"), a U.S. Citizen based in New York, were married in 2013 and had a child (the "Minor Child") together. (Presentence Investigation Report ("PSR") ¶ 10). Brent was a successful owner of a well-known art gallery in New York and had a premarital net worth of at least approximately $13 million (*id.* ¶¶ 10, 12); the defendant, on the other hand, did not work during the marriage and served as a stay-at-home father for the Minor Child (*id.* ¶ 10). During their marriage, the defendant and Brent lived primarily in New York, but they also owned other properties including in Havana, Cuba, and Rio de Janeiro, Brazil. (*Id.*).

On March 15, 2022, the defendant filed for divorce from Brent, citing an irretrievable breakdown of the relationship. (*Id.* ¶ 11). Shortly prior to filing for divorce, the defendant moved out of his apartment with Brent and moved in with his close friend, Maria Gomez ("Maria"), who had worked for Brent and the defendant as a housekeeper at their apartment in Manhattan, and her daughter Jessica Gomez ("Jessica") who lived in Queens, New York. (*Id.*; *see also* Trial Transcript ("Tr.") 371). Maria and Jessica were very close to the defendant and Brent, and they considered each other as family. (Tr. 315-316, 364). Maria and the defendant would take trips together, and Maria was the godmother to the Minor Child. (Tr. 364).

The divorce proceedings were contentious and continued throughout 2023 up until Brent's murder on January 14, 2024. (*Id.* ¶ 12). During the divorce, the parties fought about money. (*Id.*). The defendant demanded millions of dollars from Brent. For example, on May 18, 2023, the defendant wrote to Brent, "I want 6 million dollars transferred to my account . . . the alimony that corresponds to me for having been married to you." (*Id.*). However, Brent rejected the defendant's demands and instead offered $1 million in the divorce, which the defendant refused to accept. (*Id.*; Tr. 373).

In around mid-2023, the defendant began to tell people that he wished Brent would die. (PSR ¶ 13). For example, on July 14, 2023, the defendant stated in an audio message, "I'm still fighting with this old bastard who won't die . . . but anyway, I'll tell you, until he dies or until someone kills him or until . . . or . . . until I get divorced, that's how it's going to be." (*Id.*). Similarly on July 20, 2023, the defendant stated in an audio message, "here I am struggling with, oh, this old bastard who won't die soon enough, for God's sake." (*Id.*).

B. Planning the Murder

Between July 2023 to January 2024, the defendant methodically engineered his husband's murder. (*Id.* ¶¶ 14-18). Specifically, starting around July 2023, the defendant hired Alejandro Prevez, a Cuban native who was then living in Sao Paolo, Brazil, to murder Brent at Brent's townhouse in Rio de Janeiro, Brazil. (*Id.* ¶ 14). As part of their agreement, the defendant made approximately ten payments totaling thousands of dollars to Prevez from July 31, 2023 through the date of the murder. (*Id.* ¶¶ 15-16).

To hide his involvement in these payments, the defendant exploited his friends and family—people who trusted him and had no idea about what the payments were for—to use their own names and identities to make payments to Prevez for Brent's murder. For example, Sikkema had Maria and Jessica make three payments totaling $1,900 to Prevez in their own names via Western Union between July 31, 2023 and August 23, 2023. (*Id.* ¶ 15). As detailed previously, Maria and Jessica viewed Brent as family and had no idea when they made the payments that they were made for his murder. For example, the defendant lied to Jessica telling her that he needed to make the payment because Prevez's family in Cuba had sent money to the defendant and he needed to transmit it to Prevez in Brazil. (Tr. 321). And, Maria testified that when he asked her to make a wire transfer for him, she did not "question it" as they had a "very close relationship." (*Id.* at 375). In addition to Maria and Jessica, the defendant also had a friend based in Florida send $600 via Western Union in his own name to Prevez, and the defendant had his cousin in Cuba send $300 to Prevez's romantic interest, Dailyn Hidalgo Hernandez. (PSR ¶ 15).

In addition to manipulating his friends and family to make payments for the murder on his behalf, the defendant also stole the identity of another individual (Pedro Mainer) to make additional payments to Prevez. (*Id.* ¶ 16). Mainer, at the time, had moved to New York in 2023 from Cuba without legal status and had previously worked for the defendant as a handyman in Cuba. (*Id.*). At the time Mainer moved to New York, he lived with the defendant for a few months before moving to a shelter. (*Id.*). Before that move, the defendant had convinced Mainer to leave his passport with the defendant for safekeeping. (Tr. 506-507). Between approximately October 18, 2023 to January 5, 2024, the defendant made five payments to Prevez totaling $1,700 via Western Union using Mainer's identity and used Mainer's name to send a DHL package to Prevez in Brazil on August 18, 2023. (PSR ¶ 16).

The defendant's exploitation of his former employees and supposed friends to facilitate and hide his own involvement in the murder, however, did not stop with these payments. The defendant also had Prevez set up a secret phone line (the "Raimundo Number") for the defendant using identifying information of a former housekeeper of his in Brazil named Maria Das Dores. (*Id.* ¶ 17). Das Dores had worked for Brent and the defendant for over ten years as a housekeeper, had provided Brent and the defendant her CPF identifying number (which is similar to a social security number in the United States) to make certain purchases, and had no idea that her CPF number had been used to set up the Raimundo Number. (Tr. 713, 719-721).

At around the time of these payments as well as the activation of the Raimundo Number, Prevez acted on his part of the agreement by taking steps to plan and carry out the murder. Specifically, between August 25, 2023, and August 28, 2023, Prevez traveled from Sao Paolo, Brazil to Brent's townhouse in Rio de Janeiro, Brazil. (PSR ¶ 17). During the trip, Prevez entered Brent's home and took photographs while inside. In addition, between December 9, 2023 and December 11, 2023, Prevez traveled again to Brent's townhouse in Rio de Janeiro from Sao Paolo, Brazil, to carry out the murder, while Brent was at his home in Rio de Janeiro. (*Id.*). However, Prevez failed to complete the murder during that trip. (*Id.*).

The defendant was complicit in every step Prevez took to plan and commit Brent's murder. For example, after the August 2023 trip, the defendant wrote to Prevez via electronic messaging, "Thanks very much Ale for everything you're doing. There will be a day when life rewards us for all this." (Government Trial Exhibit ("GX") 901, GX 953, GX 953-M, GX 953-T). In addition, a few weeks after the December 2023 trip, Prevez celebrated to his romantic interest Hernandez that he was going back to Rio de Janeiro in January 2024 as he had been given "another chance." (GX 801, GX 866, GX 866-T).

Around the time of these trips, the defendant continued to talk about his wish for Brent's death and how he would profit from it. For example, in an audio message on December 11, 2023, the defendant stated, "And well, there we are in the divorce process, which never ends. . . .Well, he can take all the time he wants. Let's see if instead of getting divorced, I end up a widower, which would suit me much better." (GX 700B, GX 737, GX 737-M, GX 737-T).

C. The Murder

The murder took place in the early hours of January 14, 2024. The prior day, on January 13, 2024, Prevez traveled from Sao Paolo to Rio de Janeiro, Brazil. (PSR. ¶ 18). On January 14, 2024, at approximately 3:42 a.m., while Brent was sleeping alone in his bed, Prevez entered Brent's home in Rio de Janeiro and stabbed him 18 times, killing him. (*Id.*). At approximately 3:57 a.m., Prevez left Brent's home and almost immediately called Sikkema via the Raimundo Number. (*Id.*).

Even more tragically, Brent's body was not discovered until the next day by his friend and lawyer, Simone Nunes. (*Id.*). As Nunes details in a victim impact statement to this Court, attached hereto as Exhibit ("Ex.") A, the experience of finding Brent's body "profoundly affected [her] emotional health and [her] will to live." She writes:

> I developed post-traumatic stress disorder and had to take medical leave from work. I began psychiatric and psychological treatment, including medication and weekly therapy sessions. For nearly two and a half years, I had great difficulty resuming my life. During that time, I felt as though my own existence had been suspended and had lost its meaning, marked by pain and the struggle to move forward. In addition to losing someone I considered a brother, I had to cope with the trauma of finding him in that condition.

(Ex. A).

While others suffered profound devastation from Brent's loss, the defendant, on the other hand, having now received confirmation that Brent had been successfully murdered, arranged for more money to be paid to Prevez. (PSR ¶ 18). Specifically, on January 15, 2024, the defendant arranged for his cousin in Cuba to deliver thousands of dollars to Hernandez (Prevez's love interest) in Cuba. (*Id.*). The defendant also promised to pay even more money to Hernandez at a later date. (*Id.*).

Around this same time, the defendant continued to communicate with Prevez, including by trying to help him escape from Brazil. Although the defendant deactivated the Raimundo Number shortly after Brent's murder, he continued to communicate with Prevez in the days following the murder including through his cousin's telephone number and through Facebook. (*Id.* ¶ 19). In the only electronic communication between the defendant and Prevez in the days following Brent's murder that the Government was able to recover, the defendant appeared gleeful at the violent murder of Brent, sending Prevez via Facebook messenger the following emoji of a bunny:



(*Id.*). In the days following the murder, Prevez also plotted his escape from Brazil, including plans to travel to the United States, an idea suggested to him by the defendant. (*Id.* ¶ 20).

D. <u>The Aftermath, the Cover Up, and the Obstruction</u>

Prevez was arrested in Brazil for Brent's murder on January 18, 2024. (*Id.* ¶ 21). After Prevez's arrest, the defendant tried to hide his role in the murder-for-hire, including by lying about his relationship with Prevez. (*Id.*). For example, the defendant told Nunes shortly after the murder that while Prevez had worked for him in Cuba, he did not have a phone number for Prevez nor did he have any calls or texts with Prevez. (*Id.*; Tr. 238-39). In addition, the defendant told Brent's niece that he did not know that Prevez was in Brazil. (PSR ¶ 21). The defendant also lied to federal law enforcement after he was arrested on March 20, 2024 for passport fraud by claiming, for example, that he did not make any of the payments in the name of Mainer to Prevez. (*Id.* ¶ 26).

In addition to lying to hide his involvement, the defendant attempted to bribe Mainer. (*Id.* ¶¶ 24-25). Several weeks after Brent's murder, the defendant called Mainer and asked to meet him at a restaurant in Queens. (*Id.* ¶ 24). At the restaurant, the defendant told Mainer that he had accidentally used his passport to send money to Prevez. (*Id.*). The defendant then asked Mainer to say that Mainer had been the one who sent the money to Prevez if law enforcement asked him about it. (*Id.*). In that same conversation, the defendant brought up $3,000 that he had promised to pay Mainer as additional compensation for construction work that Mainer performed for the defendant in Cuba more than a year prior. (*Id.* ¶ 25). At the restaurant, the defendant stated that he would give Mainer the $3,000 once "he got over this problem." (*Id.*). The defendant had not mentioned this money since the first time he had agreed to give it to Mainer more than a year prior and Mainer understood the defendant's reference to the money as trying to buy his "silence" so that he would take responsibility for sending payments to Prevez. (*Id.*).

While the defendant was lying and attempting to bribe people to hide his involvement in the murder that he had planned and directed, the defendant showed no remorse and instead greedily attempted to claim Brent's assets that he described as "rightfully" his own. (*Id.* ¶¶ 22-23). For example, on March 2, 2024, the defendant sent an audio message in which he indicated that he "couldn't care less" about Brent's death, and stated " . . . he's better off dead, he's better off dead . . . when I go to claim what's rightfully mine, I'm going to be ruthless, absolutely ruthless, with all of them." (*Id.* ¶ 23). And, ruthless the defendant was: Within weeks of Brent's murder, the

defendant asked for an appraisal of Brent's art gallery; tried to move into Brent's apartment in New York; made plans to rent out Brent's Brazilian properties (which despite being the place where Brent was stabbed and killed, the defendant described as a "dream"); and spoke about his plans to sell all of Brent's artwork in Brazil. (*Id.* ¶ 22; GX 700B, GX 747, GX 747-M, GX 747-T). The defendant also bragged that because he was still legally married to Brent at the time of his death, the defendant was entitled to 30-percent of Brent's property and assets, which amounted to approximately $7 million, and that it was more than he would have received in the divorce. (PSR ¶ 22). In fact, in approximately March 2024, the defendant served a notice of election on Brent's estate attorney, attempting to claim 30-percent of Brent's total assets as his surviving spouse. (*Id.*).

## II. Procedural History and Guidelines Calculation

On February 11, 2025, a grand jury in this District returned a superseding indictment, S1 24 Cr. 227 (the "S1 Indictment"), charging the defendant with (i) murder-for-hire conspiracy, resulting in death, in violation of 18 U.S.C. § 1958 and 2 (Count One); (ii) murder-for-hire, resulting in death, in violation of 18 U.S.C. §§ 1958 and 2 (Count Two); and (iii) conspiracy to commit murder in a foreign country, in violation of 18 U.S.C. § 956(a)(1) and (a)(2)(A) (Count Three). (*Id.* ¶¶ 1-4, 27). The S1 Indictment also included a passport fraud charge, which the Government later moved to dismiss prior to trial. (*Id.* ¶ 27).

After a two-week trial, on May 22, 2026, a jury convicted the defendant of all three counts pending in the S1 Indictment. (*Id.* ¶¶ 1, 27). Counts One and Two each require a mandatory life sentence. *See* 18 U.S.C. § 1958(a) (stating that if death results, the crime "shall be punished by death or life imprisonment"). As calculated by the U.S. Probation Office ("Probation"), Count Three has a Guidelines range of life (PSR ¶ 90), and Probation recommends a sentence of life on this count to run concurrently (*id.* at 27).

## III. Defendant's Sentencing Submission

On October 15, 2026, the defendant submitted his sentencing submission. (Dkt. 113). In that submission, the defendant acknowledges that Counts One and Two carry a mandatory sentence of life imprisonment and therefore does not seek any sentence less than that. (*Id.* at 1). Instead, the defendant makes the following two requests:

First, the defendant requests several clarifications or corrections to the PSR. (*Id.* at 4-6). The Government's responses to each of those requests are below:

**1. ¶ 50 (Order of Protection):** The Government disagrees that this sentence can be "misread as an order *against*" the defendant. (*Id.* at 4 (emphasis in original)). Instead, the sentence makes clear that it was an order of protection "issued to the defendant" "against his now deceased husband." The Government, however, has no objection to moving this paragraph out of the "Other Criminal Conduct" section.

**2. ¶ 51 and p. 27 ("fugitive from a foreign country"):** The Government does not dispute that the defendant did not flee from Brazilian authorities; however, it is correct that the defendant is wanted by authorities in Brazil for the murder of which he was convicted in

this case. In addition, there is an active Interpol Red Notice for the defendant related to these charges in Brazil.

**3. ¶¶ 67 and 69 (medications):** The Government has no objection to the requested changes to these paragraphs.

**4. ¶ 10 and footnote 2 (family):** The Government has no objection to amending the PSR to note that "[the Minor Child] regards both men as his fathers and was raised by both" and that Daniel acted as "[the Minor Child's] primary caregiver and managed the family's homes."

**5. Spelling:** The Government has no objection to the requested name corrections.

Second, the defendant requests that the Court recommend to the Bureau of Prisons ("BOP") waiver of the sentencing length public safety factor and recommend designation to a medium-security institution near New York City, preferably FCI Otisville. (*Id.* at 5-8). The Government does not take a position on this request and defers to the expertise of the BOP, which has the exclusive statutory authority to designate prisoners' places of imprisonment. 18 U.S.C. § 3621(b). However, the Government does stress the seriousness and circumstances of this offense, which is detailed further in this submission, including that the defendant was able to order the murder of his husband from an entirely different country, largely through electronic communications.

## IV. Discussion

### A. Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In the case of first-degree murder, the Sentencing Commission recommends that "life imprisonment is the appropriate sentence if a sentence of death is not imposed." U.S.S.G. § 2A1.1, comment. (n.2); *see also*, *e.g.*, *United States v. Quinones*, 511 F.3d 289, 318 (2d Cir. 2007) (explaining that, when the Guidelines were mandatory, but "district courts [had] some discretion to depart," the Guidelines "strongly discouraged such departures in the cases of premeditated murder.").

B. The Court Should Impose a Life Sentence on Each Count

The defendant orchestrated and paid for the violent murder of his husband—Brent Sikkema. The defendant was motivated by greed and has not to this date expressed remorse for what he did. Nothing can ever fully right this wrong. Brent's family and friends can never be made whole. For this crime, the defendant must serve a sentence of life imprisonment on Counts One and Two. As further explained below, a Guidelines sentence of life imprisonment on Count Three is also appropriate in this case.

**1. The Nature and Circumstances of the Offense**

The nature and circumstances of the defendant's offense warrant a life sentence for several reasons.

*First*, it is difficult to overstate the seriousness of any murder. The murder here though was particularly egregious. It was not a murder born of panic or planned in haste. Instead, it was a calculated, prolonged, and cold-blooded murder-for-hire scheme, which the defendant directed and financed over the course of approximately half a year. During that period, the defendant hired a hitman, used others' identities to mask his own involvement, created a secret phone line, and made thousands of dollars of payments to his accomplice. And the murder was uniquely heinous. As Probation explained, Brent was "viciously stabbed approximately 18 times inside of his home, where he should have felt safest, and as a result of a betrayal by the person who at one time should have loved him the most." (PSR at 29). The defendant's deliberate and methodical planning makes this homicide particularly egregious and supports a sentence of life imprisonment.

The defendant also carried out this scheme by betraying the trust of people who viewed him as family. As detailed above, the defendant manipulated and deceived friends and former employees into unknowingly facilitating the murder. For example, the defendant took advantage

of the loyalty of Jessica and Maria—who had given him a place to stay at the beginning of his divorce and who was the godmother of his child—by tricking them into making payments to Prevez to facilitate Brent's murder on his behalf. The defendant's willingness to exploit his former employees though did not stop there: the defendant also stole the identities of two other former employees—Das Dores and Mainer—and used those identities to set up a secret phone line to facilitate his communications with Prevez and make additional payments to Prevez for the murder. Moreover, when the murder was done, the defendant attempted to bribe Mainer into claiming responsibility for the payments the defendant made to Prevez. This conduct demonstrates the defendant's willingness to harm others to advance his goals, as well as his disrespect for the law and utter disregard for the consequences inflicted on innocent people. Not only did the defendant force these individuals to become unknowing abettors in a murder plot, but, by using their names instead of his own, the defendant either planned or at least was willing to take the risk that one of them would be suspected of being involved in Brent's murder.

It is also worth pausing on the specific individuals that the defendant chose to manipulate and exploit as part of his murder-for-hire scheme. The defendant did not target just anyone. Instead, nearly every person whose trust he abused was someone who had worked for him—individuals such as a housekeeper and a handyman over whom he had held a position of authority. The power imbalance was not incidental; it was the very mechanism he leveraged to carry out and conceal the crime. And the person he exploited most was Mainer, who had arrived in the United States without legal status, with almost no possessions, and was living in a shelter. The defendant preyed upon Mainer's vulnerability, using his identity both to finance the murder and later attempting to coerce him into taking the blame and bearing false witness—underscoring the defendant's willingness to sacrifice others in order to secure his own financial gain.

*Second*, the defendant's attitude toward Brent's murder, both before and after it was complete, further underscores the extraordinary depravity of the offense. In the months leading up to Brent's murder, the defendant showed no hesitation in seeking Brent's murder, but instead seemed to believe that Brent's murder was justified. For example, in August 2023, the defendant wrote to Prevez, "Thanks very much Ale for everything you're doing. There will be a day when life rewards us for all this." The defendant also showed no remorse after he learned that, due to his plan, Brent had died after being stabbed eighteen times in his bed. Instead of sadness, the defendant spoke proudly and gleefully about Brent's death, and immediately turned to claiming Brent's assets. He attempted to seize property, arrange to rent the same property where Brent had been violently killed, and sell Brent's artwork—all while the investigation was unfolding and while Brent's family and friends were grieving. The defendant's actions reveal that he did not view his husband's violent death as a tragedy, but as a windfall allowing him to finally claim that money he believed was "rightfully" his. This reaction reflects a profound moral indifference that no term of years would adequately address.

*Finall*y, a sentence of life imprisonment is also necessary to reflect the loss and pain the defendant's crime caused not only to Brent, but also to his survivors and bereaved. The defendant robbed Brent of a future and shattered the lives of Brent's loved ones, a void that can never be filled. As a reflection of what Brent's loss meant to his family and friends, and to the community more generally, the Government attaches the following victim impact statements: Simone Nunes (Exhibit A), Maria Das Dores (Exhibit B), Ada Cowlishaw, Brent's niece (Exhibit C), and Gabriel

Nunes, Simone Nunes's son (Exhibit D).[1] These statements detail the profound devastation that Brent's death has caused. For example, Das Dores describes Brent as a "cheerful, understanding, and honest person like no other" and writes that "[t]here are days when I'm overcome by such deep sadness in my [heart] that it hurts, and my eyes won't dry up." (Ex. B). In addition, Brent's niece writes, in part:

> I am writing this statement because I need the Court to understand the depth of the devastation his murder has caused—not only because he was my uncle, but because he was one of the last remaining connections I had to my father and to my family.
>
> . . .
>
> Nothing this Court does can bring [Brent] back or give us the years that were taken from him. But I ask the Court to recognize the lasting impact of what was done to him and to the people who loved him. [Brent] was not simply a victim in a criminal case. He was a brother, an uncle, a family member, and a person who was deeply loved.

(Ex. C). The defendant's horrific crime also took Brent from their son, the Minor Child. Brent will never get to see the Minor Child graduate high school and college and grow into an adult, and the Minor Child—who testified that he "loved" Brent "very much"—will never get to move through life with the care and love of his other father. (Tr. 1034). The crime's impact cannot be overstated and necessitates a life sentence.

**2. The Need for Deterrence, to Protect the Public, and Promote Respect for the Law**

The need for specific and general deterrence, to protect the public from further crimes by the defendant, and to promote respect for the law also require a life sentence in this case. The defendant's actions show complete disrespect for the law and a willingness to employ extreme and calculated violence to resolve perceived slights and disputes. The defendant resorted to the most serious crime one can imagine all because Brent refused to capitulate to his demands during the divorce. The defendant also stopped at nothing to accomplish these goals, stealing the identities of his former employees, attempting to lie and deceive federal law enforcement, and attempting to bribe someone to try to cover up his involvement.

Even more concerning, the defendant has never expressed remorse for his actions or accepted responsibility for what he did. In exercising his right to trial, the defendant has repeatedly tried to paint Brent as a drug addict, including at trial and in his own sentencing submission, who seemingly deserved what was coming to him. (*See* Dkt. 113 at 3). The defendant's unwillingness to express remorse for his actions, even in the face of the overwhelming evidence at trial, is deeply

---

[1] Das Dores and Gabriel Nunes's statements were both submitted in Portuguese. The Government attaches translations of Das Dores's and Gabriel Nunes's statements.

troubling and suggests that a Guidelines sentence is particularly important for specific deterrence and protection of the public. *See United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); *United States v. Kaziu*, 559 F. App'x 32, 39 (2d Cir. 2014) (holding that "the district court properly referenced [the defendant's] lack of remorse because the fact that [the defendant] did not believe that his actions rose to the level of any crime also evinced future dangerousness"); *accord United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)).

A life sentence is also essential to send a clear and unequivocal message that murders—particularly those carried out with this level of sophistication, premeditation, and moral indifference—will be met with the harshest possible punishment. The need for general deterrence is particularly acute here where the crime crossed multiple international borders. Murder-for-hire schemes that span countries are uniquely difficult to detect, investigate, and prosecute, often requiring substantial assistance from foreign law enforcement. A life sentence communicates that individuals cannot exploit jurisdictional boundaries to evade accountability.

**3. History and Characteristics of the Defendant**

There are also no mitigating factors that warrant a sentence of less than life. (*See* PSR at 29 (explaining "the Probation Office has not identified any factors that would warrant a variance from the applicable sentencing guideline range")). As an initial matter, while the defendant's impoverished upbringing and history of childhood abuse should be considered, they do not outweigh the extreme seriousness of his offense conduct, promoting respect for the law, protecting the public, and the need for just punishment and deterrence. Nor do these mitigating factors, in any way, explain the defendant's crime, which the defendant committed in his fifties, while receiving $8,000 per month in alimony in addition to rent. (Tr. 902).

The Court should also flatly reject any attempt by the defendant to paint this crime as one committed by a man "frightened for his own safety" or the desperate act of a caring parent to protect his child. (Dkt. 113 at 3). As defense counsel concedes, (*id.*), nothing can justify the murder of Brent. But there is an additional problem with this effort to recast the defendant's motive: it is entirely contrary to the record. The evidence at trial instead showed that the defendant had not lived with Brent for approximately nine months before the murder. The Minor Child also testified that he loved Brent "very much" and that it was important to him that Brent act as a father to him. (Tr. 1033–34). Moreover, by May 2023, Brent and the defendant had already agreed to a custody arrangement as part of the divorce. (Tr. 886). In other words, nothing in the record supports the notion that Brent posed any ongoing danger to the defendant or to their child. Instead, the evidence presented at trial makes the defendant's true motive unmistakably clear: he wanted millions of dollars of Brent's assets to which he thought he was entitled. That financial motive—selfish, calculated, and entirely non-mitigating—was the driving force behind this murder.

## V. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence of life imprisonment on each of the counts of conviction is sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ___/s______________________
Meredith Foster / Remy Grosbard /
Alexander Li / Nicholas Pavlis
Assistant United States Attorneys
(212) 637-2310/-2446/-2265/-1068

cc: Richard Levitt, Esq. and Florian Miedel, Esq. (counsel for defendant) by ECF